146 Ill. App.3d 523 (1986)
496 N.E.2d 1248
In re R.M.B. (The People of the State of Illinois, Petitioner-Appellee,
v.
J.B., Respondent-Appellant).
No. 4-85-0709.
Illinois Appellate Court  Fourth District.
Opinion filed August 19, 1986.
Rehearing denied September 2, 1986.
*524 Thomas A. Bruno, of Urbana, for appellant.
Thomas J. Difanis, State's Attorney, of Urbana (Kenneth R. Boyle, Robert J. Biderman, and David E. Mannchen, all of State's Attorneys Appellate Prosecutor, of counsel), for the People.
Judgment affirmed.
*525 JUSTICE MORTHLAND delivered the opinion of the court:
J.B. gave birth to a daughter, R.M.B., on June 22, 1982. At the time of the birth J.B. was 13 years of age. J.B. and R.M.B. lived with J.B.'s parents in Rantoul, Illinois. A petition was filed in the circuit court of Champaign County on September 7, 1982, alleging that both J.B. and R.M.B. were neglected minors. R.M.B. was found to be a neglected minor, and at a dispositional hearing on March 3, 1983, the trial court ordered custody of R.M.B. placed with the Department of Children and Family Services (DCFS). A supplemental petition was filed with the court on June 25, 1985, asking that J.B. be found to be unfit and that all of her parental rights with respect to R.M.B. be terminated.
Count I of the supplemental petition alleged that J.B. had failed to make reasonable efforts to correct the conditions which were the basis for the removal of the minor from her. Count II alleged that J.B. had failed to make reasonable progress toward the return of the minor within 12 months after an adjudication. (See Ill. Rev. Stat. 1983, ch. 37, par. 702-4.) Count III alleged that J.B. was unable to discharge parental responsibilities due to mental impairment or mental illness, mental retardation as defined in section 1-116 of the Mental Health and Developmental Disabilities Code (Code) (Ill. Rev. Stat. 1983, ch. 91 1/2, par. 1-116), or developmental disability as defined in section 1-106 of the Code (Ill. Rev. Stat. 1983, ch. 91 1/2, par. 1-106). The count also alleged that such inability to discharge parental responsibilities would extend beyond a reasonable time period.
Hearings were held by the trial court on the supplemental petition on August 19, 21, 22, and 23, 1985. At the conclusion of these hearings, the court dismissed count I, but found that the allegations of counts II and III had been proved by clear and convincing evidence, and that J.B. was an unfit parent. The cause was continued to a later date for dispositional hearing; on September 26, 1985, this hearing took place. The trial court terminated all parental rights of J.B. and authorized the guardian to consent to the adoption of R.M.B.
J.B. appeals, contending that: (1) the finding of the trial court that she is an unfit parent is against the manifest weight of the evidence; and (2) J.B.'s parents were necessary parties to the proceedings.
The facts, although extensive, are not substantially controverted. In January 1982, the Department of Children and Family Services investigated the home where J.B. was living with her parents in Rantoul, Illinois. The original investigation revealed the home to be filthy, cluttered, infested with roaches, with a foul odor, and with only *526 milk and bread in the refrigerator. A visit to the home in February 1982 revealed the same conditions. After J.B. gave birth to R.M.B., the home was even dirtier and more cluttered. Oil, mechanical parts, glass containers, and metal scraps were on the floor.
R.M.B.'s permanent custody was placed with DCFS in March of 1983. Between this time and the time the petition was filed to terminate parental rights in June of 1985, the trailer where J.B. lived with her parents remained cluttered and dirty. Full ashtrays, medication, and other dangerous objects were left where they would be within the reach of a child. The dangerous objects were not removed even after a DCFS worker pointed out the necessity of removal. J.B. had to be told twice, on one occasion when R.M.B. was visiting in the trailer, to remove a pellet gun from her reach.
J.B. was afforded weekly visits with the minor. She treated R.M.B. as if she were a doll on some occasions, and as if they were competing children on other occasions. On some visits, J.B. threatened to beat R.M.B. up; at one point, J.B. made a fist and asked R.M.B. if she wanted to fight. J.B. missed some visits without explanation and often arrived late. J.B. invariably left visitations early, often after spending only 5 or 10 minutes alone with her daughter. On occasion she would lie down and sleep during the visit. A DCFS worker testified that there was no change in J.B.'s relationship with her daughter between 1983 and 1985, and that she had made no progress toward regaining custody of her daughter. The witness said that J.B. was indifferent, never acknowledged what needed to be done for R.M.B. to be returned, denied that anything needed to change, and would not discuss specific steps to take to get her daughter back. J.B. had been given lessons in parenting techniques and skills, but did not appear interested. She never used those skills in dealing with R.M.B., and in fact, appeared to forget them. She likewise did not give any positive guidance to R.M.B.
DCFS at one time wanted to place both J.B. and R.M.B. in a foster home so that J.B. would have the full-time responsibility for caring for R.M.B. while under constant supervision. J.B. refused this arrangement.
Dr. J. Adrian Williams, a psychologist, testified with respect to certain tests and interviews he conducted with J.B. He was of the opinion that J.B. was both mildly mentally retarded and paranoid schizophrenic. He testified with respect to her retardation that she would be able to function at a minimal level of self-sufficiency, but would have serious difficulties discharging parental responsibilities.
Dr. Williams also interpreted the test results and interviews to *527 show that J.B. had difficulty with abstract thinking, had a great deal of hostility and aggressive tendencies, and showed signs of delusions, hallucination, and impairment of reality. She responded to frustration in a physical, aggressive manner. It was Dr. Williams' opinion that the delusional thinking, hostility, and aggression would increase in time. The witness was of the opinion that J.B. did not have the capability to discharge her duties as a parent. This inability would extend beyond a reasonable time. He pointed out that J.B. denied having problems and would require, if she cooperated, medication, three to five years' full-time psychotherapy, including institutional treatment. After that time, J.B. would require periodic treatment for many years.
The allegations of counts II and III of the supplemental petition are based on provisions of the Adoption Act (Ill. Rev. Stat. 1983, ch. 40, pars. 1501(D)(m), (D)(p).) Those provisions read as follows:
"D. `Unfit person' means any person whom the court shall find to be unfit to have a child, without regard to the likelihood that the child will be placed for adoption, the grounds of such unfitness being any one or more of the following:
* * *
(m) failure by a parent to make reasonable efforts to correct the conditions which were the basis for the removal of the child from such parent, or to make reasonable progress toward the return of the child to such parent within 12 months after an adjudication of neglected minor under Section 2-4 or dependent minor under Section 2-5 of the Juvenile Court Act;
* * *
(p) inability to discharge parental responsibilities supported by competent evidence from a psychiatrist or clinical psychologist of mental impairment, mental illness [or] mental retardation as defined in Section 1-116 of the Mental Health and Developmental Disabilities Code, or developmental disability as defined in Section 1-106 of that Code, and there is sufficient justification to believe that such inability to discharge parental responsibilities shall extend beyond a reasonable time period."
 1 A trial court may appoint a guardian with the power to consent to the adoption of a minor under section 5-9 of the Juvenile Court Act (Ill. Rev. Stat. 1983, ch. 37, par. 705-9), but must first find by clear and convincing evidence that a nonconsenting parent is unfit. Unfitness is defined by the specific paragraphs of the Adoption Act set forth above, among others.
The findings of the trial court must be given great deference, since it has the opportunity to view and evaluate the testimony of the *528 parties and witnesses. (In re Brown (1981), 86 Ill.2d 147, 427 N.E.2d 84; In re Saadoon (1979), 78 Ill. App.3d 319, 397 N.E.2d 178.) The trial court's determination will not be disturbed unless contrary to the manifest weight of the evidence. In re Brown (1981), 86 Ill.2d 147, 427 N.E.2d 84.
In re Edmonds (1980), 85 Ill. App.3d 229, 406 N.E.2d 231, is a case in which the parental rights of a mildly mentally retarded mother were terminated after a finding that she was unfit by reason of her failure to make reasonable progress toward the return of her child within 12 months after an adjudication of neglect. The mother argued that the progress she made was reasonable for a person of her limited ability. The Edmonds court answered that contention by quoting from In re Austin (1978), 61 Ill. App.3d 344, 350, 378 N.E.2d 538, 542-43:
"`[T]he term "reasonable progress" requires at a minimum measurable or demonstrable movement toward the goal of return of the child. Whether a small amount of progress is "reasonable" must be determined with proper regard for the best interests of the child. Such an inquiry might well involve consideration of the limitations of the parents, but also would necessarily require consideration of the possibility that the child might be forced to indefinitely reside with a succession of impermanent foster parents.'" In re Edmonds (1980), 85 Ill. App.3d 229, 233, 406 N.E.2d 231, 235.
 2 The trial court here recognized the mental limitations of J.B., but also recognized that the attempts to get J.B. to act in a more mature and responsible way with R.M.B., to absorb parenting lessons, to learn programs to enable her to deal with R.M.B., and to follow up with lessons taught by the homemakers and family-aid specialists were all fairly basic and within her limitations. She is chargeable with failing to perform within those limitations.
The parents in In re Devine (1980), 81 Ill. App.3d 314, 401 N.E.2d 616, argued that since they were retarded, they could not be held at fault for their inability to care for their child. There the court stated:
"Appellants err in concluding that only a parent who is at fault may be found unfit. We assume that by `at fault' appellants mean to imply the imposition of blame because the actor knew or should have known the consequences of his act or omission. In the grounds of unfitness set forth in subsection D of section 1 of the Adoption Act (Ill. Rev. Stat. 1977, ch. 40, par. 1501D) nowhere appear such words as `wilful,' `intentional,' `knowingly,' `negligently' or any other word relating to *529 the state of mind or will of the unfit person. * * * Thus a parent can be unfit without fault. * * * A child is no less exposed to danger, no less dirty or hungry because his parent is unable rather than unwilling to give him care." 81 Ill. App.3d 314, 319-20, 401 N.E.2d 616, 620-21.
 3 The trial court accorded great weight to the testimony of Dr. Williams. It pointed out that one with the mental disabilities of J.B. might be able to eventually care for herself, but that the stress of being or attempting to be a parent was more than J.B. could tolerate. This stress could, and probably would, result in physical violence. The trial court noted that throughout the proceedings J.B. was sullen and extremely hostile toward everyone. It considered this to be like the hostility that was repeatedly exhibited toward R.M.B.
We conclude that the trial court's findings of unfitness on the part of J.B., under counts II and III, was predicated upon clear and convincing proof, and thus was not contrary to the manifest weight of the evidence.
 4 J.B. argues, without citation of authority, that her parental rights could not be terminated since she herself was a minor and her parents, although present, were not parties to the proceeding. It should be pointed out that J.B.'s parents had initially been parties, but had been dismissed without objection. They filed no motion to intervene.
Pursuant to statute (Ill. Rev. Stat. 1983, ch. 37, par. 701-20(1)), a grandparent must be made a party to the proceeding only if: (1) the grandparent is the person having custody and control of the grandchild; or (2) if the grandparent is the nearest known relative and the parent or guardian cannot be found. (In re Jennings (1977), 68 Ill.2d 125, 368 N.E.2d 864.) We point out that court appointed counsel capably represented J.B. at all stages of the proceedings. The trial court committed no error in proceeding without the grandparents, parents of J.B., as parties.
The judgment of the circuit court of Champaign County is affirmed.
Affirmed.
McCULLOUGH, P.J., and SPITZ, J., concur.